504 P.2d 642

**STATE of New Mexico, Plaintiff-Appellee,**

v.

**Reies Lopez TIJERINA, Defendant-Appellant.**

**No. 701.**

Court of Appeals of New Mexico.

Dec. 22, 1972.

Harold H. Parker, Albuquerque, for appellant.

Mario Obledo, Alan Exelrod, Michael Mendelson, Mexican American Legal Defense and Educational Fund, San Francisco, Cal., amicus curiae.

David L. Norvell, Atty. Gen., Jay F. Rosenthal, Asst. Atty. Gen., Santa Fe, for appellee.

## CERTIFICATION TO THE SUPREME COURT

PER CURIAM.

■ Pursuant to § 16–7–14(C)(2), N.M.S.A.1953 (Repl.Vol.1970) the Court of Appeals is authorized to certify to the Supreme Court issues of substantial public interest that should be determined by the Supreme Court.

Attached hereto and made a part of this Certification are the three separate opinions of the Court of Appeals. The first attached opinion would affirm the conviction on all counts. The second attached opinion would reverse and remand for a new trial on the issue of venue. The third attached opinion would reverse and remand for discharge on the issue of collateral estoppel.

It appearing that the three proposed opinions, if filed as opinions of the Court of Appeals, would create uncertainty in the law in that although there is a majority for reversal there is no guidance for the future procedure of the case and,

■ It further appearing that the Court of Appeals may not call in additional judges, see § 16–7–11, N.M.S.A.1953 (Repl.Vol. 1970) and,

It further appearing an uncertain state of law should not exist and because of this fact an issue of substantial public interest is created and should be determined by the Supreme Court.

Now, therefore, pursuant to § 16–7–14(C)(2), supra, the above captioned case is hereby certified to the New Mexico Supreme Court for decision.

## OPINION

HERNANDEZ, Judge.

Defendant appeals from a judgment and sentence following his conviction of assault with intent to commit a violent felony to-wit: to kill or to commit mayhem, § 40A–3–3, N.M.S.A.1953 (2d Repl.Vol. 6), and false imprisonment, § 40A–4–3, N.M.S.A. 1953 (2d Repl.Vol. 6). Trial was held in Bernalillo County on a change of venue. Defendant asserts eighteen points of prejudicial error, hereinafter discussed. The defendant elected to act pro se, however, the trial judge appointed counsel to assist the defendant, who did in fact participate in the trial.

The occurrence out of which the indictment of the defendant arose, which also resulted in charges being filed against several other individuals, took place on June 5, 1967, and started at about 3:00 p. m., in the Courthouse at Tierra Amarilla, New Mexico. The first participants in the drama of that afternoon were the defendant's daughter Rose and his future son-in-law who entered the courthouse and then went from office to office ostensibly looking for the place where some criminal arraignments were supposedly being held. They left and shortly thereafter she returned with three other men. State Police Officer Nick Saiz was standing in the lobby reading an item on the bulletin board. He noticed the four enter and then turned his attention back to the bulletin board. When next he noticed them, they had surrounded him and one of them, at the point of a pistol, ordered him to turn over his weapon. As he started to unstrap it the individual with the pistol shot him and he fell to the floor. Minutes thereafter the defendant carrying an AR–15 (automatic rifle) carbine and three other individuals entered the courthouse. As he reached the top of the stairs leading to the lobby, the door to the sheriff's office opened and the sheriff came out with his pistol in his hand. The defendant disarmed him and knocked him to the floor. The defendant then proceeded into the sheriff's office where he shot Eulogio Salazar, the jailer,

in the face as he was trying to escape by jumping out of a window. The jailer was shot a second time but whether by the defendant or some one else it was never determined. At the moment that Officer Saiz was being disarmed and shot, the County Commissioners were holding a meeting in a room which opened off of the lobby. Deputy Sheriff Pete Jaramillo, one of several people in the county commission room testified that he heard a shot and shouting and ran to open the door. As he reached the door it was opened from the outside by Baltazar Martinez, one of the four individuals who had confronted Officer Saiz moments before. Baltazar Martinez pointed the rifle he was carrying at the occupants of the room and told them to lie down on the floor, face down, if they didn't want to be killed. Pete Jaramillo, along with the others, did as he was told. Martinez then ordered Jaramillo to stand up and surrender his gun. Jaramillo turned to show him that his holster was empty. Martinez spotted Jaramillo's pistol close to where he had been lying on the floor and ordered Jaramillo to kick it to him and then he picked it up. During the time that Baltazar Martinez was in the county commission room the defendant together with Juan Valdez and Tobias Leyba went up to the third floor of the courthouse. After firing several shots they entered the jury room where Deputy Sheriff Daniel Rivera was. Juan Valdez struck Rivera on the head with a pistol he was carrying and ordered him to surrender his pistol. Rivera was struck twice more, once on the face and once on the arm but he was not sure which one of the three struck these blows. He was then ordered to go down and release the prisoners from the jail. Here again he did not remember which one gave the order. He went to the first floor and released the prisoners and when he returned to the lobby, Baltazar Martinez ordered him to go into the county commission room. In the meantime the defendant went back down to the lobby. A few moments later, Martinez marched the people from the county commission room into the lobby with their hands raised.

The defendant came up behind Jaramillo and stuck a rifle in his ribs and said, "tell me where Alfonso Sanchez [the district attorney] is, or I'll kill you." Jaramillo told him that Sanchez wasn't there, that Mr. Neal [assistant district attorney] was the one who had come to take care of the criminal arraignments that day. The defendant then ordered Pete Jaramillo to lie down on the floor behind the water cooler and to quit looking around. A few minutes later the defendant ordered the people all back in the county commission room and Baltazar Martinez and Baltazar Apodaca, another of the four who had confronted Officer Saiz earlier, took command and led them in. The record indicates that there were approximately twenty people being held in the county commission room and that they were detained from shortly after 3:00 p. m. until 7:00 p. m. of the same day, June 5, 1967.

Germane to some of the assignments of error claimed by defendant are the following facts, as disclosed by the record. At the time that defendant and his co-participants first entered the courthouse there were five officers in the building: Officer Saiz was in the lobby; Sheriff Naranjo and the Jailer Eulogio Salazar, who was also a deputy sheriff, were in the Sheriff's office; Deputy Sheriff Pete Jaramillo was in the county commission room attending the County Commission meeting, Deputy Sheriff Daniel Rivera was upstairs in the court room. Two other State Police Officers had been at the courthouse earlier but had left to investigate an accident. These Officers later sought to return to the courthouse but were driven off by gunfire from individuals stationed outside. The exact number of defendant's co-participants is not known. Fourteen were identified by witnesses at the trial, but it is evident that there were others. Of the fourteen identified, two were the defendant's son and daughter. Several of the participants had assembled at Canjilon, New Mexico, a small village approximately 20 miles from the courthouse, and had left there in five vehicles. Defendant testified that he had not been with the others at Canjilon but was

in Tierra Amarilla, about two blocks from the courthouse, and was called after the affray had started.

Defendant's first point is that "the trial court committed prejudicial error by refusing defendant's requested instruction relating to his right to use force in order to suppress a riot."

The instruction that was submitted to the Jury, No. 24 provided:

"You are instructed that the use of all necessary force is justified when done by any person in any of the following situations:

1. When done in the necessary defense of his life, his family, or his property, or in necessarily defending against any unlawful action directed against himself, his wife, or family; or

2. When done in the lawful defense of himself or of another and when there is a reasonable ground to believe a design exists to commit a felony or to do some great personal injury against some person or another and there is eminent danger that the design will be accomplished."

Defendant's requested Instruction No. 26, added the additional phrase:

"When necessarily done in attempting, by lawful ways and means, to apprehend any person for any felony committed in his presence, or in lawfully suppressing any riot, or in necessarily and lawfully keeping and preserving the peace."

It is well established that "a party is entitled to have an instruction on his theory of the case submitted to the jury if there is evidence reasonably tending to sustain such a theory." State v. Vasquez, 83 N.M. 388, 492 P.2d 1005 (Ct.App.1971).

There is nothing in the record to indicate that the defendant's wife was at the courthouse at any time on that day or that anyone threatened or tried to attack the defendant. The only persons injuring anyone or threatening anyone were the co-participants of

the defendant. Instruction No. 26 describes three situations in which the use of force is justified:

(1) "to apprehend any person for any felony committed in his presence";

(2) "or in lawfully suppressing any riot";

(3) "or in necessarily and lawfully keeping and preserving the peace."

An examination of the record read in light of this phrase reveals that there is no evidence that the defendant was trying to apprehend any person who had committed a felony in his presence. Juan Valdez had committed a felony, minutes before defendant entered the courthouse, when he shot Officer Saiz but there is no evidence that the defendant was trying to apprehend him.

Shortly after he entered the courthouse Baltazar Martinez committed a felony when he entered the county commission room and at rifle point falsely imprisoned all of the occupants, but there is no evidence that the defendant was trying to apprehend or suppress him. The record does not disclose whether this felony occurred in the presence of the defendant or not. However, when in the presence of the defendant, Juan Valdez struck the deputy on the head with a gun and ordered him to surrender his pistol the defendant did not try to apprehend him, suppress his actions, or disarm him. That is to say, on the two occasions (one for certain) when felonies were committed in his presence, the defendant did nothing to apprehend the person committing the act, nor did he attempt to suppress these various acts which in the aggregate constituted a riot, nor did he do anything to keep or preserve the peace. Therefore, it was not error for the trial court to refuse to give the requested instruction. State v. Vasquez, supra.

Defendant's second point is that "the trial court erred in receiving the verdict of false imprisonment of Pete Jaramillo because it in effect found the defendant was not guilty of the crime, or the verdict received was at best vague, uncertain, ambiguous and therefore void; and the concurrent sentences given to the defendant which were

based on that void verdict should be set aside and redetermined."

The trial court gave the Jury two type-written forms of verdict with regard to this charge, to-wit: "We, the jury, find the defendant Reies Lopez Tijerina GUILTY of the offense of false imprisonment of Pete Jaramillo, as charged in Count V of Information #4028." The second was identical with the exception of the substitution of the words "not guilty" for the word "guilty". The jury returned the form finding the defendant guilty, properly signed by the foreman, plus the following handwritten notation:

"We do feel in fact that the defendant did commit the act as charged, however, we feel that the motive for this may have been quite different than that implied by the State's charge, with the well being of the victim and others in mind.

s/H. Wade Zellner, Jr.
FOREMAN"

Among the instructions given to the Jury concerning this issue were the following:

"Section 40A–4–3, 1953 Compilation, N.M.S.A., as amended by Chapter 303, 1963 Laws of New Mexico provides as follows:

'False imprisonment consists of intentionally confining or restraining another person without his consent and with knowledge that he has no lawful authority to do so.' "

. . . "the material allegations of false imprisonment are as follows:

1. That the defendant, as a principal or aider and abettor, unlawfully and intentionally confined or restrained the alleged victim without his consent.

2. That this was done by the defendant with knowledge that he had no lawful authority to do so.

3. That said act occurred in Rio Arriba County, New Mexico, on the 5th day of June, 1967.

If you find and believe from the evidence beyond a reasonable doubt, all of the foregoing material allegations, then you

should find the defendant guilty of such charge. On the other hand, if you have any reasonable doubt as to the truth of any one or more of such material allegations, then you should find the defendant not guilty of such charge." . . . "Intent is an element which, if not admitted by the defendant, must of necessity be proved by circumstantial evidence, as it is a mental process which is incapable of direct proof and must be established from the facts and circumstances established and shown by the evidence."

The jury at the request of the defendant was then questioned concerning their verdict. The District Attorney asked whether each juror believed that all of the elements of false imprisonment had been proven beyond a reasonable doubt, and if he did not, to raise his hand. None did so.

The jury was questioned by defendant as to their understanding of the difference between intent and motive and this elicited the following response from the foreman, Mr. Zellner:

"Mr. Wheeler, [defendant's court appointed counsel] the way we described it to ourselves and the reason we did this is that we felt that this was just like getting caught for speeding when you are taking your wife to the hospital to have a baby, in other words you did in fact commit the crime but there was a reason for doing it, a good reason."

The trial court announced that it would receive the verdicts and the defendant objected. The court then asked the defendant if he wished to have the jury polled and he said no.

Verdicts should be liberally construed and all fair intendments should be made to sustain them. A verdict should be rejected only when it is either ambiguous, incomplete or unresponsive to the issue or issues submitted by the court. United States v. Nooks, 446 F.2d 1283 (5th Cir. 1971), People v. Bailey, 391 Ill. 149, 62 N.E.2d 796 (1945). Should there be any doubt about the meaning of a verdict it should be construed with reference to the entire record and particularly with reference to the court's instructions, to arrive at the intention of the jury. State v. Reed, 55 N.M. 231, 230 P.2d 966 (1951). If a verdict has a definite meaning and is responsive to the issue or issues, but contains nonessential language, informalities or immaterial inaccuracies, these may be treated as surplusage and disregarded. State v. Perry, 225 N.C. 174, 33 S.E.2d 869 (1945); People v. Knox, 90 Ill.App.2d 149, 234 N.E.2d 128 (1967).

Defendant maintains that the handwritten addition to the verdict "is on its face a finding that the defendant was not guilty of the crime of false imprisonment . . ." and that "at best the verdict is vague, uncertain and ambiguous and should have therefore not been received." We do not agree. The first part of the handwritten addition in clear and unequivocal terms reiterates, in the language of the jury, the typewritten part; i. e., that the defendant was guilty of the offense of false imprisonment of Pete Jaramillo. Furthermore, when questioned about their verdict the jurors reaffirmed their decision. The remaining language speaks of the defendant's motive and since motive is not a necessary element in the crime of false imprisonment, it can be disregarded as surplusage. Considering the verdict in light of the very complete instruction by the court and the statement by the jury foreman as to how they described the difference between intent and motive to themselves, there is no doubt in our minds but that the jury understood the difference between intent and motive and we therefore conclude that the verdict is not ambiguous and that it was responsive to the issues submitted by the court and that the court committed no error in accepting it.

Defendant's third point is that "the trial court erred in admitting a transcript of the prior testimony of Eulogio Salazar given at a bail bond hearing. The admission of such transcript was hearsay and constituted denial of defendant's right to confront the witness against him."

Sections 21–1–1(43)(a)(1)(i), N.M.S.A. 1953 (Repl.Vol. 4) provides:

"The testimony of any witness taken in any court, state or federal, in this state may be used in any subsequent trial or hearing of the same issue between the same parties in the following cases: (i) When the witness is dead or insane."

Defendant concedes that Eulogio Salazar was dead at the time of the trial of this cause. The bond hearing in question took place on June 15, 1967 before the Judge of the Fourth Judicial District sitting as committing Magistrate in Cause No. 3938 in the District Court of Rio Arriba County, New Mexico. The defendant along with others, was charged, among other things, with "kidnapping in violation of § 40A–4–1, N.M.S.A., 1953 Compilation, in that the said defendants did unlawfully take, restrain or confine Pete Jaramillo by force or deception, with intent that the said Pete Jaramillo be held as hostage." They were also charged with "assault with intent to commit a violent felony, to-wit: murder, in violation of § 40A–3–3, N.M.S.A., 1953 Compilation, in that said defendants did assault Eulogio Salazar with intent to commit murder." They were also charged under the same section with assault with intent to commit murder upon Daniel Rivera and Nick Saiz. That the parties are the same is evident and that the issues in the assault charges are the same is also evident. Since the principal element of the crimes of kidnapping § 40A–4–1, supra, and false imprisonment § 40A–4–3, supra, viz: confining or restraining another person without his consent or against his will are the same, this ipso facto makes the principal issue in a trial of either the same. See State v. Clark, 80 N.M. 340, 455 P.2d 844 (1969). The defendant also questions whether the bond hearing satisfies the statutory requirement that the testimony shall have been taken in "any court".

The question as to what type or character of court or tribunal it takes to satisfy the requirements of § 21–1–1(43)(a)(1)(i), supra, is a matter of first impression in this State. Our examination reveals that the law generally is as set forth in King v. State Industrial Accident Commission, 211 Or. 40, 309 P.2d 159, 315 P.2d 148, 318 P.2d 272 (1957), wherein the Supreme Court of Oregon relying, in part on McCormick, Handbook of the Law of Evidence, quotes the following from § 235 of that work:

"If the accepted requirements of the administration of the oath, adequate opportunity to cross-examine on substantially the same issue, and present unavailability of the witness, are satisfied then the character of the tribunal whether judicial, legislative, or administrative, and the form of the proceedings are immaterial, and the former testimony should be received. Accordingly, when these conditions are met, testimony taken before arbitrators, or before a committing magistrate at a preliminary hearing, or in a sworn examination before the Comptroller by the Corporation Counsel of a person asserting a claim against a city, has been held admissible."

In Industrial Commission of Ohio v. Glick, 49 Ohio App. 415, 197 N.E. 372 (1934), testimony given before referee appointed by Industrial Commission was held admissible. In re White's Will, 2 N.Y.2d 309, 160 N.Y.S.2d 841, 141 N.E.2d 416 (1957), testimony in a lunacy proceeding was held admissible. In Fleury v. Edwards, 14 N.Y.2d 334, 251 N.Y.S.2d 647, 200 N.E.2d 550 (1964), testimony given before the Motor Vehicle Bureau was held admissible. In Cupps v. City of Toledo, 118 Ohio App. 127, 193 N.E.2d 543 (1960), testimony before Civil Service Commission of the City of Toledo was held admissible. In re Falzone, 240 Mo.App. 877, 220 S.W.2d 765 (1949), testimony given before the Senate of Missouri acting in quasi-judicial capacity and passing upon the qualifications of one of its own members was held admissible. We conclude that the bail bond hearing satisfied the statutory requirement in this regard.

Defendant also maintains that because of the nature of the bond hearing, he was denied a full opportunity to fully cross-

examine and confront the witness Salazar. His argument is that since the bond hearing was conducted for the limited purpose of determining whether the accused should be admitted to bail that he did not expect that any testimony taken there would be used for any other purpose and therefore he did not cross-examine as fully as he might otherwise have done. Furthermore, the Jury did not have the opportunity to observe Salazar's demeanor on the witness stand.

The right of confrontation is provided by Article II, § 14 of the Constitution of our State, to-wit: "In all criminal prosecutions, the accused shall have the right . . . to be confronted with the witnesses against him . . . " Our courts have been called on many times to interpret this section and the law is well established and can be summarized as follows: Confrontation is satisfied if there was the opportunity to cross-examine; the observation of demeanor on the witness stand is a result of cross-examination but it is not part of the confrontation rights. State v. Jackson, 30 N.M. 309, 233 P. 49 (1924); State v. Lunn, 82 N.M. 526, 484 P.2d 368 (Ct.App.1971). The defendant was personally present at the bond hearing and represented by his attorneys. The District Attorney announced that he was going to call Salazar as a witness but since he had just been released from the hospital he did not want to aggravate his condition by asking him too many questions. The court then remarked "make it brief, and to the point and we will release him." The witness on direct examination identified the defendant as the person who had shot him in the face, and testified that the defendant and Baltazar Martinez had forced him to come back after he had tried to run away. At the close of the direct examination, the District Attorney asked that there be no cross-examination. This request was denied by the court which again admonished the parties to be brief. The witness was then questioned by one of the Attorneys for the defendant, followed by some re-direct examination. At this point, defendant's attorney and counsel for one of the other defendants requested time for

a brief conference, which was granted. After the conference, the witness was questioned by the other attorney. Aside from one question concerning what kind of work the witness did, which was ruled to be outside of the scope of the direct examination, no limitation was placed on any of the defendant's rights to cross-examine the witness. We do not consider the court's remarks about brevity to be a limitation on their right. We conclude that the trial court did not err in admitting the testimony given at the bail bond hearing.

Defendant's fourth point is that "the court erred in not allowing defendant to show that the witness Eulogio Salazar was missing due to the activity of the State." The basis of this point of error is a motion made by the defendant "that a hearing be held and evidence allowed to be submitted to prove that the State is totally involved and is responsible for Eulogio Salazar not being here at this time."

Neither defendant nor his appointed counsel made an offer of proof and an offer of proof is necessary to preserve the point for appeal. State v. Slayton, 52 N.M. 239, 196 P.2d 734 (1948), State v. Gruender, 83 N.M. 327, 491 P.2d 1082 (Ct. App.1971). And neither did defendant nor his assigned counsel object to the court's denial of the motion for a hearing. Objections not made in the court below cannot be urged on appeal. N.M.Supreme Court Rule, § 21–2–1(20)(1), N.M.S.A.1953 (Repl. Vol. 4); Crabtree v. Segrist, 3 N.M.(John.) 278, 3 N.M.(Gild.) 495, 6 P. 202 (1885), affirmed 131 U.S. 287, 9 S.Ct. 687, 33 L.Ed. 125 (1889).

Defendant's fifth point is that "the trial court erred in admitting rebuttal testimony of Eulogio Salazar's relatives, that Salazar told them that Tijerina shot him."

The general rule is that the State cannot corroborate its own witness by showing his prior consistent statements. State v. Alaniz, 55 N.M. 312, 232 P.2d 982 (1951). However, one exception to this rule is that such statements are admissible to rebut charges of recent fabrication or improper motive.

United States v. Stamey, 423 F.2d 1223 (4th Cir. 1970); Butler v. Parrocha, 186 Va. 426, 43 S.E.2d 1 (1947); People v. Rosoto, 58 Cal.2d 304, 23 Cal.Rptr. 779, 373 P.2d 867 (1962); Wigmore, Evidence §§ 1128–1129.

The trial court gave the defendant wide latitude in his questioning to the extent that many of the defendant's "questions" consisted of conclusions, accusations, and self-serving declarations. Defendant called State Police Officer Robert J. Gilliland as his witness and the following are excerpts from his examination:

"Q. MR. TIJERINA: Of course not. Mr. Gilliland has testified over and over again. He's the man that coined the word 'hate Tijerina'. It was on T.V. If he will leave his hate at this time. Mr. Gilliland, I am interested in the investigation of Eulogio Salazar because I think that you knew at the time that he stated that I had shot him, you knew, did you not, that it was a lie. You knew at the time because you had gone and investigated all the courthouse, all the witnesses. You could scratch nothing, you already knew the testimony, did you not, of Olivia, Rosemary Mercure, that she had said 'los Tijerinas' shot me. You knew that but you allowed him to lie, to lie when he testified in the bond hearing, you knew it, but then you was already conspirator for him, isn't that true?"

"A. That is not true."

"Q. MR. TIJERINA: Isn't it a fact Mr. Gilliland, that you knew that Eulogio Salazar told you that he would not stick to that statement because he couldn't find no supporting witnesses, you got that information?"

"A. Never. From the very beginning he said you were the one that shot him until the day he died, he still said you were the one that shot him."

As can be seen, under the guise of questioning the witness, the defendant accused Salazar of improper motives in testifying as he did at the bond hearing. Defendant also implied that Salazar's testimony at the bond hearing was of recent fabrication. We believe that under these circumstances the trial court did not err in admitting these prior statements.

Defendant's sixth point is that "the defendant was deprived of a complete transcript of the first trial prior to the second trial and was thus deprived of 'the instruments needed to vindicate legal rights.'"

The trial of the instant case began November 15, 1969. The record reveals that on May 13, 1969, on motion of defendant, the trial court ordered that four copies of the transcript of the first trial be prepared, excluding the testimony of Dr. Swadesh and Prof. Knowlton. The court further ordered that the original be delivered to the clerk of the criminal division of the court and that it be made available to the defendant at all reasonable times and that the copies also be made available to defendant "at such times and places as the court may order from time to time." On October 9, 1969 the trial court ordered that the testimony of Dr. Swadesh and Prof. Knowlton be prepared and that it too be delivered to the clerk of the criminal division. The record further reveals that at the first trial defendant requested permission to tape all of the proceedings, which request was granted.

Defendant's allegations on this point are without merit.

Defendant's seventh point is that "the court erred in granting the State's motion for change of venue when it was not requested by the defendant and over defendant's objections."

The parties stipulated and an order of this court was entered incorporating into the record of the instant case the "venue hearing" in Valdez v. State, 83 N.M. 720, 497 P.2d 231 (1972). At that hearing defendant's objections to the change of venue of this cause as well as the change of venue

of *Valdez* were argued and decided. Therefore, the ruling in Valdez is dispositive of this point i. e., "that a trial court, in a proper case and in the exercise of its discretion, has the power to order a change of venue sua sponte . . . This was such a case, as is amply demonstrated by the trial court's findings of fact. . . ."

Defendant's eighth point is that "appellant's second trial and conviction violates the fifth and fourteenth amendments' protection against double jeopardy and the constitutional doctrines of res judicata and collateral estoppel."

"Collateral estoppel . . . means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit. . . . United States v. Oppenheimer, 242 U.S. 85, 37 S.Ct. 68, 61 L.Ed. 161, 3 A.L.R. 516. . . . Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to 'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.' . . . Sealfon v. United States, 332 U.S. 575, 579, 68 S.Ct. 237, 240 [92 L.Ed. 180, 184]." Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970).

A general verdict of acquittal viewed alone establishes only the negative conclusion that a defendant was not guilty of a particular offense. That is why it is necessary to go back from the verdict into the record to try to ascertain its basis. That is to say, what were the essential issues that were necessarily determined by the jury in arriving at their verdict? Mathematical certainty that a verdict is dependent on a certain finding or findings is not a requisite. However, where it is impossible to say with a reasonable degree of accuracy what the essential issues were, that the jury had to determine in arriving at their verdict, collateral estoppel does not apply. Ex parte Johnson, 472 S.W.2d 156 (Tex.Cr.App. 1971).

We have previously referred to the various events that occurred at the courthouse as the "incident" merely for ease of expression and to avoid undue duplication. But before embarking on analysis of the doctrine of collateral estoppel, we would point out that what took place was not one single criminal act or occurrence. There were several criminal acts committed by various people, all of which occurred between the hours of 3:00 p. m. and 7:00 p. m. on the same day in different rooms of the courthouse. The shooting of Officer Saiz by Juan Valdez took place in the lobby. The false imprisonment of various people by Baltazar Martinez took place in the county commissioners room. Juan Valdez hit deputy Rivera over the head with his pistol and made him surrender his own pistol in the jury room. The defendant shot the jailer as he was trying to escape out of a window in the sheriff's office, etc.

In a prior prosecution a jury found the defendant not guilty of (1) kidnapping of Deputy Sheriff Dan Rivera in violation of § 40A–4–1, N.M.S.A., 1953 Compilation; (2) false imprisonment of Dan Rivera in violation of § 40A–4–3, N.M.S.A., 1953 Compilation and (3) assault upon the Rio Arriba County Courthouse and jail in violation of § 40A–22–18, N.M.S.A., 1953 Compilation. These charges arose out of the same incident at the Rio Arriba County Courthouse as the charges in the instant case. Following the criteria specified in *Ashe* we have examined the record of both trials to ascertain if the jury by the prior acquittal determined an issue of ultimate fact or facts which had to be proved by the State in the current prosecution. We can dismiss from consideration any issues that might have been determined by the jury in the prior prosecution concerning the charges of the false imprisonment and the kidnapping of Dan Rivera because the incidents between Rivera and defendant were completely separate from those involving

the defendant and Eulogio Salazar and Pete Jaramillo in this case. Consequently there were several ultimate factual issues upon any one of which the jury could have based their verdict of not guilty which need not be proved in this case. That leaves only the charge of assault upon the Rio Arriba County courthouse and jail. The elements of the crime of assault on the courthouse and jail were outlined by the court in its instructions in the prior prosecution to-wit:

*No. 16* "The statute of New Mexico on which the charge of assault on jail is based, reads as follows:

Unlawful assault on any jail consists of any person or group of persons assaulting or attacking any jail, prison or other public building or place of confinement of prisoners held in lawful custody or confinement."

*No. 17* "The essential elements of the offense of assault on jail, as charged in the Information, are as follows:

1. *That the defendant unlawfully assaulted or attacked the Rio Arriba County Courthouse and jail contained therein.*

2. That prisoners were in lawful custody or confinement in said jail.

3. *That the defendant did such act or acts with the purpose and intent of procuring the escape of any of such prisoners.*

4. That said act or acts occurred in Rio Arriba County, New Mexico, on or about the 5th day of June, 1967.

If each and all of the material allegations of the charge of assault on jail as just outlined to you have been proved to your satisfaction and beyond a reasonable doubt, then you should find the defendant guilty as charged of assault on jail; but, on the other hand, if you have a reasonable doubt as to any one or more or all of such material allegations, then you should find the defendant not guilty of the charge of assault on jail."

*No. 19* "ASSAULT OR ATTACK ON JAIL means to enter or endeavor to enter a jail by force and with violence."

*No. 24* "The Court instructs the Jury that the Defendant in order to be guilty of the charge of assault on a jail must in fact have intended, either himself, or through assisting others, to assault either the jail itself in the Tierra Amarilla Courthouse or the Tierra Amarilla Courthouse because it contained a jail.

Moreover, in order to find Defendant guilty of said charge of assaulting a jail, you must further find that said defendant either himself, or by assisting others, intended to release, molest, or in some other way inconsistent with their custody at the time, deal with the prisoners in said jail.

Finally, you are instructed that the mere fact that a jail happened to be contained within the Tierra Amarilla Courthouse is not sufficient, unless acts of defendant are present directly and intentionally aimed at said jail." [Emphasis ours.]

In reaching its verdict of not guilty on this count the jury could have found, among other things: (1) That the defendant did not participate in the unlawful assault on the courthouse. He testified that he was at the home of a friend some two blocks away when the affray started. He stated that a young boy came and told him what had happened and that he and his friend then hurried over to the courthouse in his friend's truck. As he came into the courthouse he took a rifle away from one of the participants and a pistol from another; thus trying to stop the affray. He said that he had shouted to them "you have given them an excuse to do away with all of us", or (2) that he had participated in the assault but not with the requisite intent of procuring the escape of any prisoners. There was testimony that the defendant had come looking for the district attorney, Alfonso Sanchez. If the second of these formed the basis of the jury's verdict there would be no bar to this prosecution.

As can be seen these instructions offered the jury several theories upon which the defendant could be acquitted. We cannot say with any degree of certainty or accuracy what issue or issues were determined by the jury in reaching their verdict. We, therefore cannot hold that the doctrine of collateral estoppel applies. See Ex parte Johnson, supra.

As to defendants plea of double jeopardy, "A plea of double jeopardy is unavailing unless the offense to which it is interposed is precisely the same in law and in fact as a former one relied upon under the plea.

The test for determining whether the offenses charged in two indictments are identical is whether the facts alleged in one, if offered in support of the other, would sustain a conviction. Where one indictment requires proof of a fact which the other indictment does not, the several offenses charged are not identical." Bartlett v. United States, 166 F.2d 928 (10th Cir. 1948); Owens v. Abram, 58 N.M. 682, 274 P.2d 630 (1954). After applying these criteria to the facts in this case we conclude that the defense of double jeopardy is not applicable.

Defendant's ninth point is that "it was error to allow the change of the Judge to try the case after both sides had agreed on a judge but after he began to rule favorably to the defense."

The agreement referred to was a stipulation in Cause No. 3938 and did not relate to the instant cause. The objection is without merit.

Defendant's tenth point is "that Judge Burks and Judge Larrazolo committed error in proceeding with either trial since this entire cause was already decided by a dismissal."

Defendant cites no authority, and indeed does not even make argument in support of his claim.

Section 21–2–1(15)(12), N.M.S.A., 1953 Compilation (Repl. Vol. 4), states:

"On every principal proposition urged, the New Mexico decisions, if any, shall be cited; or counsel shall state an opinion that the question is one of first impression in this jurisdiction."

Defendant neither cites New Mexico case authority nor states that the question is one of first impression here.

Section 21–2–1(15)(14), N.M.S.A., 1953 Compilation (Repl. Vol. 4), states:

"The form and order of treatment of the brief in chief shall be: . . . (d) Argument and authorities on each point relied on."

Defendant cites not one authority for his position. His entire argument consists of one sentence restating his point, including an incorrect transcript citation:

" . . . Points on appeal not argued and not supported with citation to authority are deemed abandoned and will not be reviewed. Novak v. Dow, 82 N.M. 30, 474 P.2d 712 (Ct.App.1970). . . . ." Wilson v. Albuquerque Board of Realtors, 82 N.M. 717, 487 P.2d 145 (Ct.App.1971).

Defendant's eleventh point is "that the Attorney General had no authority to prosecute these cases that arose in Rio Arriba County."

Defendant made no objection during the trial to the Attorney General's participation. Section 21–2–1(20)(2), N.M.S.A., 1953 Compilation (Repl. Vol. 4), states:

" . . . to preserve the question for review it must appear that a ruling or decision by the trial court was fairly invoked."

Defendant's twelfth point is "that judgment was entered by dismissal as to indictment No. 4005 (aggravated kidnapping of Eulogio Salazar based upon appellant's alleged assault of Salazar) and that finding is dispositive of the court charging defendant with assault with intent to commit a violent felony on Eulogio Salazar."

Defendant's allegation is without merit. An accused is put in jeopardy within the meaning of the guaranty against double jeopardy when he is placed on trial in a court of competent jurisdiction, on a valid accusatory pleading, before a jury duly em-

paneled and sworn. State v. Ferris, 80 N.M. 663, 459 P.2d 462 (Ct.App.1969); State v. Rhodes, 76 N.M. 177, 413 P.2d 214 (1966). The jury had not been empaneled when indictment No. 4005 was dismissed.

Defendant's thirteenth point is that "error was committed when defendant was not allowed to bring in evidence of the land grants when others were allowed to do so."

At the beginning of the voir dire examination of the jury the trial court said that it anticipated that evidence might be introduced connecting the incidents which occurred at the Rio Arriba County courthouse with the Alianza Federal de Los Pueblos Libres, an organization which concerned itself with land grant matters. During the examination the District Attorney asked if any of the jurors were members of that organization or whether any of them had contributed money to it. The trial court gave the following instruction: "The validity of land grants is not to be determined or decided in this case." This was the extent of the trial court and State's comments or questions concerning land grants.

As to the allegation that defendant was not permitted to introduce evidence relating to land grants the record discloses that no offer of proof was made. "Absent an offer of proof, the exclusion of evidence cannot be attacked on appeal." State ex rel, State Highway Commission v. Steinkraus, 76 N.M. 617, 417 P.2d 431 (1966).

Defendant's fourteenth point is that "the court erred in commenting that Governor David F. Cargo's testimony was not relevant."

The record discloses that the defendant made no objection to the court's comment. "There is a fundamental principle permeating the entire law that parties must make known to the court their objections to the action, or proposed action, of the court. otherwise the objection will be deemed to be waived." State v. Woo Dak San, 35 N.M. 105, 290 P. 322 (1930).

It taxes the credulity of the court to accept the bona fides of this claim of error. We would remind counsel that a lawyer owes the same duty of candor to the courts that he does to his clients.

Defendant's fifteenth point is that "the court erred in not giving a citizen's arrest instruction to the jury."

The requested instructions were as follows:

"You are instructed that if the defendant reasonably believed that a police ambush was taking place, he had a right to defend himself and his family from the Police by the use of all necessary force."
. . . "The court instructs the jury that you may conclude from the evidence or believe to the extent to having a reasonable doubt, that what occurred on June 5, 1967, at the Rio Arriba County Courthouse in Tierra Amarilla was an attempted police ambush, a law enforcement conspiracy against the defendant and the Alianza, or something of similar nature placing the principal blame on the authorities; and you may therefore, if you come to that result, conclude from this that the defendant is not guilty. This conclusion you may reach in your sole judgment of the evidence before you."

The defendant's theory that he was defending himself from a police ambush is not supported by the evidence.

"The defendant is not entitled to an instruction on a theory of the case that rests upon mere speculative assertions manufactured wholly from thin air." Pacheco v. United States, 367 F.2d 878 (10th Cir. 1966). "It is a universal rule that instructions should be confined to issues upon which testimony was given during the trial." State v. Beal, 55 N.M. 382, 234 P.2d 331 (1951).

Defendant's sixteenth point is that "the court erred in excluding the testimony of Alfonso Sanchez."

The trial court did not exclude any testimony of Alfonso Sanchez. What it did do was not allow the defendant to question him concerning some matters which were objected to and the objection was sustained. Furthermore, the defendant made no tender of proof. State ex rel. State Highway Commission v. Steinkraus, supra.

Defendant's seventeenth point is that "the court erred in instructing the jury that conspiracy of law enforcement officers against appellant was not a defense to the crimes charged."

The trial court did not give such an instruction to the jury. The pages cited by defendant in his brief refer to a colloquy between the defendant, his court-appointed counsel, the District Attorney and the court out of the presence of the jury.

Defendant's eighteenth point is that "the court committed prejudicial error in calling the events of June 5, 1967 at Tierra Amarilla 'crimes' when this was the issue at trial."

The pages cited by the defendant in his brief refer to some comments made by the court during the colloquy mentioned under point seventeen and were made outside of the presence of the jury.

We affirm.

It is so ordered.

## OPINION

SUTIN, Judge.

Defendant was convicted of false imprisonment, § 40A–4–3, N.M.S.A.1953 (2nd Repl. Vol. 1972), and assault with intent to commit a violent felony, § 40A–3–3, N.M.S.A.1953 (2nd Repl. Vol. 1972). Defendant appeals.

This conviction is reversed because the trial court did not have the power, sua sponte, to change the venue from the First Judicial District to the Second Judicial District. This reversal is based on three grounds: (1) Statutory common law in criminal cases, as a rule of procedure, was repealed. (2) Common law rule of change of venue by a trial judge sua sponte in a criminal case does not exist. (3) That part of the venue statute which allows the state to change venue is unconstitutional.

## INTRODUCTION TO OPINION

In State v. Valdez, 83 N.M. 632, 495 P.2d 1079 (Ct.App.1972), this court held that the trial court had jurisdiction to order a change of venue from one judicial district to another contrary to statutory law, Judge Sutin dissenting. The Supreme Court affirmed the majority opinion. It held, (1) under common law, in a proper case and in the exercise of its discretion, a trial court had the power to order such change of venue sua sponte; (2) § 21–5–3, N.M.S.A. (Repl. Vol. 4) did not preclude sua sponte action by the trial court. Valdez v. State, 83 N.M. 720, 497 P.2d 231 (1972). This decision was docketed in the Supreme Court of the United States August 16, 1972. It should be reconsidered by the Supreme Court of New Mexico.

We are confronted with the identical venue record in this case that was present in Valdez, supra.

(1) *Statutory Common Law Rule of Practice in Criminal Cases Repealed.*

From 1851 to 1963, the following statute was in effect:

*In criminal cases,* the common law, as recognized by the United States and the several states of the Union, *shall be the rule of practice and decision.* [New Mexico Statutes Annotated, 1915, § 1355]. [Emphasis added.]

During this period, the common law which covered crimes was in force in New Mexico and would remain in force until it was repealed or modified by statute. Likewise, common law procedure would continue in force until special provision was made by statute to the exclusion of common law procedure. Territory v. Montoya, 17 N.M. 122, 125 P. 622 (1912); State v. Rogers, 31 N.M. 485, 247 P. 828 (1926).

The above statute was expressly repealed under the 1963 Criminal Code. Section 40A–1–1, N.M.S.A.1953 (2nd Repl. Vol. 6).

Section 40A–1–3, N.M.S.A.1953 (2nd Repl. Vol. 6) provides:

> *In criminal cases where no provision of this code is applicable,* the common law, as recognized by the United States and the several states of the Union, shall govern. [Emphasis added.]

It should be noted that common law procedure, "the rule of practice and decision," was not reenacted. It was excluded. The above statute provided only for the common law to govern such crimes not covered by the code.

From 1876 to the present time, and during the same period that the common law rule in criminal cases was in effect, § 21–3–3, N.M.S.A.1953 (Repl. Vol. 4) was also in force. It states:

> In all the courts in this state the common law as recognized in the United States of America, shall be *the rule of practice and decision.* [Emphasis added.]

A review and study of these statutes match a game of chess between the state and a defendant. Many problems arise. (1) From 1851 to 1963, did the common law set forth in § 1355, supra, apply only to *criminal* cases, and § 21–3–3, supra, apply only to *civil* cases? If not, why not? If so, does § 21–3–3, supra, now cover common law procedure in *criminal* cases? (2) Does § 40A–1–3, supra, cover common law crimes only? Does it supersede § 21–3–3, supra, in criminal cases? (3) Is change of venue jurisdictional or a matter of criminal practice and decision? (4) Does the common law rule on change of venue sua sponte supersede the statutory rule? To answer these questions would require a law review article. See, The Proposed New Mexico Criminal Code by Henry Weihofen, 1 Nat.Res.Journal, p. 123. On page 125, Professor Weihofen states:

> The main purpose of any codification is to bring order and system out of a wilderness of specific provisions, by establishing certain unifying basic principles.

The failure of this state to have a permanent committee on statutory laws to properly codify all New Mexico statutes causes courts to judicially enact the law in place of the legislature.

Section 40A–1–3, supra, controls in criminal cases. Since it did not include the "rule of practice and decision" and it repealed the previous statute with this provision included, the common law procedural rule *in criminal cases* was abolished. Southern Union Gas Company v. City of Artesia, 81 N.M. 654, 472 P.2d 368 (1970). With the common law rule of procedure in criminal cases abolished and the procedural rule on change of venue fully covered by statute, the only procedure available for change of venue is § 21–5–3 through § 21–5–7, N.M.S.A.1953 (Repl. Vol. 4). Sellman v. Haddock, 62 N.M. 391, 310 P.2d 1045 (1957). The common law as the rule of practice and decision in New Mexico applies only where there are no special statutory provisions in respect to a matter. Walker v. New Mexico & S. P. R. Co., 165 U.S. 593, 17 S.Ct. 421, 41 L.Ed. 837 (1897). In New Mexico, we have special statutory provisions on change of venue.

The common law rule of practice in criminal cases was abolished by repeal of the statute adopted in 1851.

(2) *A Common Law Rule in Criminal Cases on Change of Venue Sua Sponte does not Exist.*

In Valdez v. State, supra, the Supreme Court relied on Crocker v. Justices of Superior Court, 208 Mass. 162, 94 N.E. 369 (1911), 21 Ann.Cas. 1061, for the proposition that the power to change venue sua sponte existed at common law.

In *Crocker*, a petition for a writ of mandamus was filed in the Supreme Court of Massachusetts to compel the Superior Court to entertain and decide *motions for change of venue* from one county to another. The Superior Court believed it had no jurisdiction even though several statutes had been passed enlarging the venue of actions. The Supreme Court said:

> In the light of the history of our common law and the jurisdiction of our

courts, we are of opinion *that these statutes, so far as they empower a transfer in order to secure an impartial trial,* are but declaratory of the common law and confer no new power. . . . [Emphasis added]

It must be noted that the Superior Court had jurisdiction to change the venue *when motions were filed pursuant to statutory law.* Discussion of the common law power of the King's Bench sua sponte was *dicta.* The English cases examined were decisions *after* the date of the common law. A large number of cases to the contrary are cited in a footnote. The *Crocker* case said:

There are authorities collected in a footnote which seems to have a contrary appearance. It is not necessary to examine them one by one. Most of them are to be distinguished as arising under constitutions which have some controlling provision, *or under statutes or Codes which cover the whole subject-matter of change of place of trial in great detail and leave nothing to be governed by the common law.* [Emphasis added.]

*Crocker* does not stand for the proposition that a trial judge has the common law power sua sponte, without a motion having first been filed by an accused pursuant to statutory law, to change the place of trial over the objection of the accused.

In Massachusetts, Crocker, supra, is cited as authority for the proposition that:

It is well settled that, *when legislation covers the entire field,* the provisions of the common law in conflict therewith are no longer in force. [Emphasis added.] [City of Boston v. Edison Electric Illuminating Co., 242 Mass. 305, 136 N.E. 113 (1922)].

In Commonwealth v. Handren, 261 Mass. 294, 158 N.E. 894 (1927), the court said:

The right of the superior court to order a change of venue from one vicinage to another for the purpose of securing an impartial trial is a common-law right, which can be exercised in all cases *not*

*controlled by constitutional or statutory enactments.* [Emphasis added.]

In State v. Superior Court of Marion County, 202 Ind. 456, 174 N.E. 732 (1931), the court said:

While a common-law right to a change of venue upon certain grounds has been recognized in some jurisdictions where no complete statute upon the subject matter exists, Crocker v. Justices (1911) 208 Mass. 162, 94 N.E. 369, 21 Ann.Cas. 1061, the general rule is that a change of venue can be asserted and be exercised *only* in the manner provided by statute and in accordance with the provisions thereof. [Emphasis added.]

In State ex rel. Fox v. LaPorte Circuit Court, 236 Ind. 69, 138 N.E.2d 875 (1956), the court after citing the footnote language from Crocker, supra, said:

The Legislature in Indiana has, by statute, covered the whole subject-matter of change of venue, in both civil and criminal cases, and has left nothing to be governed by the common law.

In any event, the common law of Massachusetts is not necessarily the common law of New Mexico because the common law of one state is not necessarily the common law of another. Browning v. Estate of Browning, 3 N.M. (John) 371, 3 N.M. (Gild) 659, 9 P. 677 (1886). The Massachusetts rule is not the common law rule in Indiana, State ex rel. Fox v. LaPorte Circuit Court, supra, nor the common law rule in New York.

It is interesting to note that the common law rule did not carry into New Mexico, the concept of common law marriage, In re Gabaldon's Estate, 38 N.M. 392, 34 P.2d 672 (1934), 94 A.L.R. 980; the poor laws of England, Ex parte Wallace, 26 N.M. 181, 190 P. 1020 (1920), the ancient English statute of Gloucester, Blake v. Hoover Motor Co., 28 N.M. 371, 212 P. 738 (1923), condemnation proceedings, City of Tucumcari v. Magnolia Petroleum Co., 57 N.M. 392, 259 P.2d 351 (1953).

In Murphy v. Extraordinary Special & Trial Term, 294 N.Y. 440, 63 N.E.2d 49 (1945), 161 A.L.R. 937, the court said:

> We repeat that during the entire period when New York was a colony of the English crown *no case has been found where the Court of Kings' Bench granted an application for the trial of a charge of a felony before a jury drawn from a county other than the county where the alleged felony was committed,* though in some cases judges of such distinction that their considered *dicta* are at times accepted as authoritative pronouncements of the law, have asserted that the power to grant such an application existed at common law and would be exercised in exceptional circumstances where otherwise an impartial trial could not be had. . . . [Emphasis added.]

In New Mexico, we look to the common law of England as it existed prior to the year 1776. State v. Massey, 58 N.M. 115, 266 P.2d 359 (1954). This is erroneous. The common law of England dates back to the fourth year of the reign of James The First, or 1607, when the first English settlement was founded in this country at Jamestown, Virginia. The body of laws of England, as they then existed, now constitutes our common law. Addington v. State, 199 Kan. 554, 431 P.2d 532 (1967); Crocker, supra.

The common law of England applicable in New Mexico is the lex non scripta, the unwritten law, and such statutes of Great Britain of a general nature, in amendment of the common law, *not local to that kingdom* and *not in conflict with* the Constitution of the United States, the acts of Congress, or *the constitution and laws of this state* and which are suitable to the condition of our inhabitants *and in force at the time of the emigration of our ancestors to this country.* Browning v. Estate of Browning, supra.

Until such time as it is proven, not by way of dicta, that the common law of England in the year 1607, and prior thereto, and not local to England, granted a district judge the power to order a change of venue

sua sponte, it is not the common law of New Mexico.

From the foregoing, we conclude, (1) that there is no common law rule in New Mexico which grants a district judge power to grant a change of venue sua sponte, and (2) that, if such a rule did exist, it was abrogated in criminal cases by statutory law on change of venue.

(3) *That Part of the Venue Statute Which Allows the State to Change Venue is Unconstitutional.*

Sections 21–5–3 and 21–5–6, N.M.S.A. 1953 (Repl. Vol. 4) provide that in all criminal cases, the venue shall be changed upon motion of the state from one county to another in the same judicial district. If the state objects to a change of venue to any other county within the same judicial district, it shall be changed to some county of the nearest judicial district.

The record indicates that the state sought a change of venue from the First Judicial District. The record does not disclose any purported motion filed.

The time has come to question the constitutionality of §§ 21–5–3 and 21–5–6, supra, as applied to criminal cases which give the state the right to a change of venue.

Article II, § 14 of the New Mexico Constitution provides in part:

> In all criminal prosecutions, the accused shall have the right to appear and defend himself in person, and by counsel; to demand the nature and cause of the accusation; to be confronted with the witnesses against him; to have the charge and testimony interpreted to him in a language that he understands; to have compulsory process to compel the attendance of necessary witnesses in his behalf, *and a speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed.* [Emphasis added.]

This was adopted by the people of New Mexico, not for the protection of the state, nor the public generally. It was adopted to protect any person accused of crime. This

is the spirit and intent and meaning of the emphasized language. If the public is displeased with this provision, the people who gave it can take it away. The will of the people, as expressed in their constitution, is the supreme law of the land. State ex rel. Sedillo v. Anderson, 53 N.M. 441, 210 P.2d 626 (1949). The sanctity of this provision should not be violated by judicial arrogance.

Section 40A–1–15, N.M.S.A.1953 (2nd Repl. Vol. 6) provides in part:

> All trials of crime *shall* be had in the county in which they were committed, . . . [Emphasis added.]

The word "shall" is mandatory, § 1–2–2 (I), N.M.S.A.1953 (Repl. Vol. 1), because such construction is consistent with the manifest intent of the legislature and in consonance with the New Mexico Constitution. It follows the 1846 Kearny Code, Practice of Law in Criminal Cases, § 13. New Mexico Statutes Annotated 1953, p. 111 (Repl. Vol. 1).

The constitution and statute, supra, are a mandate of the people and the legislature. The only person who should have the protection of the venue statute, § 21–5–3, supra, is that person accused of crime. See, Murphy v. Extraordinary Special & Trial Term, supra. Only the defendant may waive his right or file a motion for a change of venue.

Any statute which authorizes a change of venue in a criminal case, on motion of the state, from one county to another, or from one judicial district to another against the objection of the defendant, is void because it is in conflict with Article II, § 14 of the Constitution. State v. Knapp, 40 Kan. 148, 19 P. 728 (1888); Addington v. State, supra; State ex rel. Hartinger v. Court of Common Pleas, 84 Ohio App. 241, 86 N.E.2d 810 (1948); People v. Powell, 87 Cal. 348, 25 P. 481 (1891), 11 L.R.A. 75; Willis v. O'Brien, 151 W.Va. 628, 153 S.E.2d 178 (1967), cert. den. 389 U.S. 848, 88 S.Ct. 71, 19 L.Ed.2d 116 (1967); State v. Black, 131 Or. 218, 282 P. 228 (1929); In re Nelson, 19 S.D. 214, 102 N.W. 885 (1902);

Chadwick v. State, 201 Tenn. 57, 296 S.W. 2d 857 (1956); Blume v. State, 244 Ind. 121, 189 N.E.2d 568 (1963).

There is a conflict of authority. It is simple for courts to take the plain and clear language in the constitution and statute, supra, and judicially create a rule of law by evolving exceptions to the mandate. This was done in New Mexico to assist the state, not the person accused of crime. State v. Holloway, 19 N.M. 528, 146 P. 1066 (1914). Some of the cases cited supra were rejected in *Holloway*.

What the Holloway court overlooked is that phrase of the constitution, supra, which provides that "[i]n all criminal prosecutions, the accused shall have the right to . . . a speedy public trial by an impartial jury of the county. . . ." [Emphasis added]. It does not say that the state shall have that right. Holloway, supra, should be overruled.

This case should be reversed. The defendant is entitled to a new trial in Rio Arriba County.

## OPINION

HENDLEY, Judge.

Convicted of false imprisonment (§ 40A–4–3, N.M.S.A.1953 (2d Repl.Vol.1972) and assault with intent to commit a violent felony (§ 40A–3–3, N.M.S.A.1953 (2d Repl. Vol.1972)), defendant appeals.

This is the second trial of this defendant for alleged crimes committed during a "raid" on the courthouse in the town of Tierra Amarilla which occurred on June 5, 1967. The first trial took place in Bernalillo County on a change of venue from Rio Arriba County in late 1968. At the end of that trial the jury returned general verdicts of acquittal on a different charge of false imprisonment, additional charges of kidnapping, and assault on a jail. Pointing to this prior acquittal, defendant argues that the State is precluded by the double jeopardy provisions of the United States Constitution from bringing this second prosecution.

I am not unaware of our Supreme Court cases of State v. Johnson, 52 N.M. 229, 195 P.2d 1017 (1948) and Paulos v. Janetakos, 46 N.M. 390, 129 P.2d 636 (1942) which might cause an affirmance under the foregoing facts. However, recent rulings of the United States Supreme Court, which we are bound to follow, dictate a reversal and remand for discharge of the defendant. The following is a discussion of those cases and their application to the instant case.

In Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), the Fifth Amendment guarantee against double jeopardy was held enforceable against the States through the Fourteenth Amendment. In Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), the rule of collateral estoppel was held to be incorporated in the guarantee against double jeopardy. The "practical approach" to be followed in determining whether the doctrine of collateral estoppel applies in any given case was described in *Ashe* as follows:

> " . . . Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to 'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.' The inquiry 'must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.' . . . "

Here there is no dispute that the incident on which the criminal charges in both trials are founded actually occurred. The issue is rather whether the defendant participated in the crimes alleged. For purposes of this appeal the most important charge of which the defendant was acquitted in his first trial was that of assault on a jail (§ 40A–22–18, N.M.S.A.1953 (Repl.Vol.1964)). Since all of the charges against defendant were founded on his alleged participation in that assault it is his acquittal of this charge which is most significant in the evaluation of his claim of double jeopardy.

The recent case of Turner v. Arkansas, 407 U.S. 366, 92 S.Ct. 2096, 32 L.Ed.2d 798 (1972) is most significant in determining the effect of the acquittal. In *Turner* the defendant was tried for the murder of one Yates who was also robbed at the time of the murder. At the murder trial the following instruction was given:

> " 'An accessory is one who stands by, aids, abets, or assists . . . the perpetration of the crime.

> " 'All persons being present, aiding and abetting, or ready and consenting to aid and abet, in any felony, shall be deemed principal offenders, and indicted or informed against, and punished as such.' "

Turner was acquitted of murder. After the acquittal Turner was indicted for the robbery of Yates. In response to Turner's claim that the second prosecution was barred by collateral estoppel the State of Arkansas argued that Turner could have been acquitted of murder because the jury believed that, although Turner robbed Yates, someone else present had committed the murder. Pointing to the accessory instruction quoted above, the Court responded to the State's argument as follows:

> "Had the jury found petitioner present at the crime scene, it would have been obligated to return a verdict of guilty of murder even if it believed that he had not actually pulled the trigger. The only logical conclusion is that the jury found him not present at the scene of the murder and robbery, a finding which negates the possibility of a constitutionally valid conviction for the robbery of Yates. . . ."

Turning to the present appeal, we find that the following instruction was given at defendant's first trial:

> "You are instructed that every person concerned in the commission of an offense, whether he directly commits the

offense or procures, counsels, aids or abets in its commission, is guilty thereof as a principal. The evidence of aiding and abetting may be by acts, conduct, words, signs, or by any means sufficient to incite, encourage or instigate commission of the offense or calculated to make known that commission of an offense already undertaken has the aider's support or approval. Mere presence, of course, and even mental approbation, if unaccompanied by outward manifestation or expression of such approval, is insufficient."

It is apparent that this instruction is substantially the same as that given in *Turner*.

Applying the reasoning of *Turner* to the present case, it is clear that when the jury acquitted the defendant of the charge of assault on a jail, both as an accessory and as a principal, that the only rational basis for such a verdict was a finding that he did not participate in any of the criminal activities which took place during the assault and which constituted part or parts of that assault. The record of the second trial is replete with the identical proof used in the first trial. The state was allowed a wide latitude of proof in the first trial on its theory of defendant aiding and abetting.

In light of the above quoted instruction, if the jury found that the defendant had participated in any of the criminal activities which took place in the Tierra Amarilla courthouse on June 5, 1967 he should have been found guilty of the crime of assault on a jail, either as a principal or as an aider and abettor. Conversely, failure to convict defendant of that crime, either as principal or as an aider and abettor, means that the jury concluded that defendant did not participate in any of the alleged crimes perpetrated at the courthouse. This being so, the State is precluded by the collateral estoppel effect of the double jeopardy provisions of the Fifth Amendment from trying the defendant again for any alleged crimes committed during the so-called "raid" on the Tierra Amarilla courthouse.

The fact it is uncontroverted that defendant was present in the courthouse during at least some of the events on which the charges are based is immaterial. As the aiding and abetting instruction makes clear, mere presence at the scene of a crime is not sufficient to sustain a conviction as an aider and abettor.

By reason of the foregoing, I would reverse and remand with instructions to discharge the defendant.

It is so ordered.